3:23MJ1038 (TOF)

| | | |
|---|---|---|
| **STATE OF CONNECTICUT** | : | ss: CITY OF HARTFORD |
| | : | |
| **COUNTY OF HARTFORD** | : | November 22, 2023 |

## AFFIDAVIT

I, Jeffrey Poulin, being duly sworn, depose and state the following:

## INTRODUCTION

1.  I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), in that I am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516, offenses set forth in Title 21, United States Code and other federal felony offenses. I have been a member of the Wethersfield, Connecticut, Police Department since 2003. From October 2011 to the present, I have been assigned to the DEA's Hartford Resident Office ("HRO") as a Task Force Officer ("TFO").

2.  I make this affidavit in support of applications for search warrants for the cellular telephone contents and records of three cellular telephones identified in Attachment A and herein as follows:

    a.  A black colored Samsung SM-S918U cellular phone ("**Target Device 1**"), with telephone number 203-241-2378, which was seized by DEA investigators on November 17, 2023, during the execution of a federal search and seizure warrant at 108 Bellevue Street, Meriden, CT, which is the residence of Jose ALEJANDRO. On that same day ALEJANDRO was taken into custody on an arrest warrant that was issued in the District of Connecticut. **Target Device 1** was located on a night-stand in the master bedroom.

    b.  A black and silver colored Samsung folding style cellular phone ("**Target Device 2**"), with telephone number 860-357-1060, which was seized by DEA investigators on November 17, 2023, during the execution of a federal search and seizure warrant at 108 Bellevue Street, Meriden, CT, which is the residence of Jose ALEJANDRO. On that same day ALEJANDRO was taken into custody on an arrest warrant that was issued in the District of Connecticut. **Target Device 2** was located on a night-stand in the master bedroom.

1

c. A black Samsung cellular phone ("**Target Device 3**") with unknown telephone number, which was seized by DEA investigators on November 17, 2023, during the execution of a federal search and seizure warrant at 108 Bellevue Street, Meriden, CT, which is the residence of Jose ALEJANDRO. On that same day ALEJANDRO was taken into custody on an arrest warrant that was issued in the District of Connecticut. **Target Device 3** was located on a night-stand in the master bedroom.

3. **Target Devices 1, 2 and 3** are collectively referred to as the "**Target Devices**." The **Target Devices** are in the custody of the DEA at the Hartford Resident Office, 716 Brook Street, Suite 110, Rocky Hill, CT where they have remained since November 17, 2023. The **Target Devices** were seized on November 17, 2023, pursuant to a federal search and seizure warrant at 108 Bellevue Street, Meriden, CT. For the reasons set forth herein, I have probable cause to believe and I do believe, that the contents and records of the **Target Devices** will contain evidence, contraband, fruits, or instrumentalities of violations of: 21 U.S.C. § 841 (Unlawful Possession with Intent to Distribute and Distribution of Controlled Substances); 21 U.S.C. § 846 (Conspiracy and Attempt to Commit Narcotics Trafficking Offenses); and 21 U.S.C. § 843(b) (Use of a Communication Facility to Commit a Drug Felony) (collectively the "Target Offenses").

4. With respect to the **Target Devices**, the requested warrants would authorize the forensic examination of **Target Devices**, including accessing all internal applications within the **Target Devices**, for the purpose of identifying electronically stored data as particularly described in Attachment B.

5. I am one of the case agents who directed this investigation. As a case agent, I am intimately familiar with the facts and circumstances of this investigation. I was personally involved in the investigative activities undertaken during this investigation. The facts set forth herein are based on, *inter alia*, my personal knowledge and participation in this investigation, information provided to me and other investigators, information from a source of information and a confidential

source, information that I obtained from public records, law enforcement databases and other reliable sources, and other information which I have reviewed and determined to be accurate and reliable. Because this affidavit is submitted for the limited purpose of obtaining authorization for the requested search warrants, I have not included each and every fact I know about this investigation. I have set forth only those facts necessary to establish a foundation for the requested warrants

## PROBABLE CAUSE

6.     During the month of November 2023, a Wethersfield Police Department Confidential Source, herein CS, at the direction of DEA HRO investigators, began communicating telephonically with a male identified as Jose ALEJANDRO regarding the purchase of an amount of fentanyl from ALAJENADRO.  Specifically, the CS communicated with ALEJANDRO over telephone number 203-241-2378 (i.e. **Target Device 1**).  Ultimately, the CS and ALEJANDRO agreed to meet on November 9, 2023.

7.     Previously, information provided by the CS has been found to be accurate, true and reliable. DEA HRO investigators have been able to independently corroborate information provided by the CS. In addition, the CS previously has participated proactively in DEA investigations. This proactive participation has led to the seizure of significant quantities of narcotics, and the arrest and conviction of individuals involved in those investigations.

8.     Previously, DEA HRO investigators received information a Source of Information (the "SOI") regarding Jose ALEJANDRO. The SOI advised that ALEJANDRO is distributing kilogram quantities of fentanyl in the area of central Connecticut. The SOI advised that ALEJANDRO receives kilogram quantities of fentanyl from sources of supply in Mexico. The SOI advised that ALEJANDRO resides at 108 Bellevue Street, Meriden, CT and utilizes telephone

number 860-357-1060 (**Target Device 2**). Information provided by this SOI has been found to be accurate, true and reliable. Information provided by the SOI has been independently corroborated by investigators.

9.    Investigators obtained subscriber and toll record information from AT&T, with regard to telephone number **Target Device 2**. These records revealed that the "user information was listed as "Jose Alejandro" at "108 Bellevue Street, Meriden, CT 06451", which is the known residential address of ALEJANDRO.

### Controlled Purchase of Fentanyl from ALEJANDRO on 11/9/23

10.    On November 9, 2023, DEA investigators met with the CS at a predetermined location for the purpose of conducting a controlled purchase of fentanyl from ALEJANDRO. At this pre-determined location, the CS and his/her vehicle were searched by DEA investigators for narcotics and other contraband. These searches resulted negatively.

11.    The CS was provided with $1750 in DEA official authorized funds (OAF) and outfitted with a recording device. The CS, who was followed by investigators, drove to the area of the car wash on Hanover Street in Meriden. Prior to the CS's arrival in Meriden, DEA HRO investigators established positions of surveillance in the area of 108 Bellevue Street and the car wash.

12.    At approximately 2:21 p.m., an investigator observed a male, subsequently identified as ALEJANDRO, depart 108 Bellevue Street in a tan Ford F-150. ALEJANDRO was wearing a black T-Shirt and red baseball hat.

13.    At approximately 2:24 p.m. investigators observed ALEJANDRO arrive in the Ford F-150 at the car wash. ALEJANDRO exited the Ford F-150 and appeared to be waiting in the lot. DEA investigators in the area positively identified ALEJANDRO at this time.

14.     Just prior to the CS's arrival at the car wash ALEJANDRO communicated with the CS via **Target Device 1** and advised that upon the CS's arrival at the meeting location, the CS should follow AJEJANDRO. Investigators observed the CS arrive at the lot of the car wash. Moments later, ALEJANDRO departed the lot in the Ford F150 and was followed by the CS. Investigators, in turn, followed the CS.

15.     The CS followed ALEJANDRO to 108 Bellevue Street, Meriden, CT. Once there ALEJANDRO parked his Ford F-150 and approached the CS's vehicle. ALEJANDRO engaged the CS in conversations and provided the CS with two samples of fentanyl. Shortly thereafter, the CS departed the area of 108 Bellevue Street as followed by investigators.

16.     Investigators met the CS at a pre-determined location. At this location, the CS turned over two knot-tied pieces of plastic, each containing an amount of suspected fentanyl. The CS stated, in sum, that ALEJANDRO had two different types of fentanyl for sale, one being of better quality. ALEJANDRO advised that the lesser quality fentanyl could be purchased for $25 a gram and the better quality fentanyl could be purchased for $32 a gram. ALEJANDRO advised the CS to have each sample tested and then advise ALEJANDRO which product the CS wanted to buy. The CS advised ALEJANDRO that if the testing yielded positive results, then the CS would be purchasing 50 grams from ALEJANDRO.

17.     At approximately 3:10 p.m., at the direction of investigators, the CS began communicating with ALEJANDRO via **Target Device 1** in order to arrange a controlled purchase of fentanyl. Upon speaking the ALEJANDRO, the CS advised that he/she wanted to purchase 50 grams of the better quality fentanyl, at $32 per gram. ALEJANDRO then advised the CS to come to 108 Bellevue Street to complete the purchase.

18. At approximately 4:11 p.m., the CS was followed by investigators to the area of 108 Bellevue Street. Upon arriving the CS parked on the street and was subsequently greeted by ALEJANDRO outside. The CS exited his vehicle and followed ALEJANDRO into the residence at 108 Bellevue Street. Once inside the residence, the CS was provided with approximately 50 grams of fentanyl in exchange for $1,600 in DEA OAF. Moments later, the CS exited the residence alone and departed the area, as followed by investigators.

19. DEA investigators met with the CS at a pre-determined location. Once there, the CS turned over a plastic knot-tied bag containing an amount of compact white powder, suspected to be fentanyl. The CS and his/her vehicle were also searched by investigators for excess narcotics and/or other contraband. This search resulted negatively. Investigators debriefed the CS, who advised, in sum, that upon arriving to the residence the CS followed ALEJANDRO in the front door. Once inside the residence, the CS waited in the dining room area of the residence, while ALEJANDRO went out of sight. The CS suspected, based on the noises that he/she was hearing, that ALEJANDRO went to the basement area of the residence. Shortly thereafter, the CS advised that ALEJANDRO emerged and provided the CS with the bag of fentanyl in exchange for the $1,600 in DEA OAF. The CS advised that there was a small female child present in the home while the CS was there. The CS also advised that an adult female arrived to the home, while the CS was there, and it appeared that she had arrived home from work. The CS advised that the adult female was not involved in the narcotics transaction.

20. Myself and SA Boyle transported the samples of fentanyl and the bag of purchased fentanyl to the DEA HRO. Once there, I subject a portion of white powder, from the purchased fentanyl, to a chemical test, utilizing a fentanyl field test kit. During this field test, I observed a positive reaction for the presumptive presence of fentanyl in the portion tested. The

aggregate weight of the purchased fentanyl, and the knot-tied plastic bag, was approximately 53.3 grams.

### Arrest of ALEJANDRO and search warrant execution

21.     On November 16, 2023, the Honorable Magistrate Judge Thomas O. Farrish authorized a criminal complaint for ALEJANDRO for possession with intent to distribute and distribution of fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B). Additionally, Judge Farrish also authorized a federal search and seizure warrant for ALEJANDRO's residence, being that of 108 Bellevue Street, Meriden, CT.

22.     On November 17, 2023, at approximately 6:00 a.m. DEA Investigators, with assistance of the DEA Special Response Team (SRT), executed the federal search and seizure warrant at 108 Bellevue Street, Meriden, CT. ALEJANDRO was located in the residence and taken into custody without incident.

23.     Investigators next conducted a search of the residence and located several items of evidence associated with the packaging and distribution of fentanyl, to include the following:

- Approximately 1278.9 grams of suspected fentanyl;
- Numerous items associated with the processing and packaging of fentanyl, including cutting agents, respirators, sifters, and wax folds commonly associated with fentanyl that is packaged for street-level sales;
- One Smith and Wesson 9mm and miscellaneous 9mm ammunition; and
- **Target Devices 1, 2 and 3.**

24.     With respect to the **Target Devices,** all three cellular telephones were located on a night-stand table, in the master bedroom, that was adjacent to the bed. Based on the observations of the investigators on scene, the nightstand on which the **Target Devices** were located, was closest to the side of the bed in which ALEJANDRO slept.

25.     While on scene myself, as witnessed by SA Boyle, I called telephone number 203-241-2378 and I observed **Target Device 1** ring. Additionally, I then called telephone number 860-357-1060 and I observed **Target Device 2** ring. With regard to **Target Device 3**, said device was powered on, but the screen showed that **Target Device 3** had no SIM card and no network service.

<u>**Evidence regarding Target Device 1**</u>

26.     As described above, during the controlled purchase on November 9, 2023, the CS communicated with ALEJANDRO via **Target Device 1** to arrange and orchestrate the purchase of approximately 50 grams of fentanyl. Specifically, ALEJANDRO communicated with the CS via text message and voice calls. All communications between the CS and ALEJANDRO over **Target Device 1** were made at the direction of DEA investigators.

27.     Verizon, who is the service provider for **Target Device 1**, advised that **Target Device 1** is subscribed to "Catherine Cirillo" at "93 Knob Hill Rd Meriden CT" and was activated on July 9, 2023. Presently, investigators are unsure what the relationship is between ALEJANDRO and CIRILLO. However, I know from my training, experience and participation in this and other narcotics investigations that it is common for narcotics traffickers to have telephone devices activated in the names of their associates. This is done for several reasons, to include disassociating themselves from these devices or to thwart the efforts of law enforcement.

<u>**Evidence regarding Target Device 2**</u>

28.     As detailed above, previously investigators received information from a source of information (SOI) regarding ALEJANDRO. The SOI advised that ALEJANDRO is distributing kilogram quantities of fentanyl in central Connecticut. The SOI advised that ALEJANDRO receives kilogram quantities of fentanyl from sources of supply in Mexico. The SOI advised that ALEJANDRO resides at 108 Bellevue Street, Meriden, CT and utilizes telephone number 860-

357-1060 (**Target Device 2**). Investigators previously obtained subscriber and tolls records from AT&T which corroborated the fact that ALEJANDRO is the subscriber of (**Target Device 2**).

29. On several occasions, DEA investigators conducted toll analysis with regard to **Target Device 2**. This toll analysis uncovered the following:

- **Target Device 2** communicated approximately 8 times with Mexican telephone number 52-XXXXXXXXXX (which is known to the DEA) between the dates of September 15, 2023 and September 26, 2023. Previously, DEA investigators from another field division identified this Mexican number as being used by a certain individual who is referred to in this affidavit as "Fugitive-1". Fugitive-1 is currently a DEA fugitive and narcotics source of supply operating in the Culiacan, Mexico area. DEA Connecticut investigators have previously identified Fugitive-1 as being a kilogram fentanyl source of supply for several individuals that are involved in distributing kilogram quantities of fentanyl in Central Connecticut.

- **Target Device 2** communicated approximately 1,111 times with telephone number 203-980-8716, which Verizon wireless confirmed is subscribed to Catherine Cirillo at 93 Knob Hill Road, Meriden, CT. As described herein, Cirillo is the subscriber of **Target Telephone 1**. While Cirillo and ALEJANDRO's relationship is unknown, it is clear that Cirillo activated **Target Telephone 1** for ALEJANDRO to use.

- **Target Device 2** communicated approximately 3 times with **Target Telephone 1** (i.e. 203-241-2378) on October 26th, 27th and 29th. These communications consisted of two voice calls and one text message. I know from my training, experience and participation in this and other narcotics investigations that narcotics traffickers frequently use several telephonic devices to conduct their illicit activities and often segregate the use of these devices. For example, a narcotics trafficker might use one device to communicate with their source of supply, but use another device to speak to their customers. Take for example the text message, which was sent from **Target Device 2** to **Target Device 1**, on October 29, 2023. In this instance, ALEJANDRO could have been sending a photograph, or screen shot from **Target Device 2** to **Target Device 1**. He then could use **Target Device 1** to resend this message. This would be done if ALEJANDRO did not want to use **Target Device 2** to transmit this message. While there are several explanations as to why ALEJANDRO would communicate between **Target Device 1** and **Target Device 2**, it is clear that he is actively using both devices to communicate with associates involved in narcotics trafficking.

9

**Evidence regarding Target Device 3**

30. With regard to **Target Device 3**, presently investigators do not know the telephone number for **Target Device 3**. As described above, **Target Device 3** was seized during the search of 108 Bellevue Street, Meriden, CT. **Target Device 3** was located on the bedroom night-stand, adjacent to **Target Device 1** and **Target Device 2**. **Target Device 3** was powered on, but the locked screen indicated that there was no SIM card and no network service.

31. Throughout the course of this investigation, ALEJANDRO was identified as the user of several telephonic devices, namely **Target Device 1** and **Target Device 2**. Investigators believe that ALEJANDRO used both **Target Device 1** and **Target Device 2** to communicate regarding narcotics trafficking activities and for a period of time he used these devices contemporaneously.

32. The fact that **Target Device 3** was powered on, with no SIM card and no network service, leads me to suspect that **Target Device 3** was being actively used by ALEJANDRO and was likely being used over WIFI. I know from my training, experience and participation in this and other narcotics investigations that narcotics traffickers will often utilize telephonic devices connected over WIFI to communicate regarding their illicit activities. This is done primarily to thwart the efforts of law enforcement who might actively be engaged in a variety of electronic surveillance techniques. I have also learned, throughout the course of this investigation, that Fugitive-1, who has been identified as a narcotics source of supply, primarily uses encrypted applications (i.e. WhatsApp, Signal, Threema, etc.) to communicate with members his narcotics DTO. I further know, from my training, experience and participation in this and other narcotic investigations, that narcotics traffickers will commonly use encrypted applications, when connected to WIFI. Based on these factors, I suspect that ALEJANDRO was using **Target**

**Device 3** while connected to WIFI and was using said device to communicate regarding his illicit activities.

33. Based on my training and experience, I know that cellular telephones are a "tool of the trade" of narcotics trafficking and that narcotics traffickers often use multiple cellular telephones conduct their narcotics trafficking and money laundering activities. Drug traffickers commonly possess and use multiple cell phones simultaneously to conduct their drug trafficking activities and must keep these phones in their actual or constructive possession (i.e., in their vehicles, residences, and businesses) to have ready access to them. This is so because drug traffickers often require the use of a telephone facility to negotiate times, places, schemes, cost, and manners for importing, possessing, concealing, and distributing controlled substances, and for arranging the laundering and concealment of proceeds derived from the sale of controlled substances. It is common for these cell phones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and businesses. Drug traffickers often do not discard their cell phones immediately after they stop actively using them. Therefore, while it is common for drug traffickers to stop using specific cell phones, it is far less common for drug traffickers to actually discard their cell phones after they switch to new cell phones. As a result, I am aware that collections of cell phones have been found during the execution of drug trafficking search warrants, including cell phones that were no longer being used by a particular drug trafficker, but had nevertheless been retained and contain evidence of their narcotics trafficking activities.

34. I know from my training and experience that persons involved in drug trafficking crimes commonly communicate using multiple cell phones. Drug traffickers may have one cell phone that is used to communicate with one particular co-conspirator (such as a source of

supply) or a small group of associates (such as a small group of persons involved in a particular transaction) and other cell phones that are used to communicate other co-conspirators (such as other sources, customers, transporters or other associates). Contemporaneous possession of multiple cell phones is, therefore, evidence of drug trafficking. Moreover, the particular numbers of and the particular numbers dialed by particular cell phones can be evidence of drug trafficking.

35. I know that drug traffickers must maintain telephone listings of clients and suppliers to efficiently conduct their drug trafficking business, and that such listings are frequently kept inside their cell phones. I am aware that drug traffickers sometimes take trophy photographs of their drugs, drug proceeds and firearms, photographs of their associates or photographs of vehicles and property purchased with drug proceeds or used to facilitate drug trafficking activities, and that drug traffickers often retain these photographs on their cell phones. I know that cell phones may contain evidence of a drug dealers travel, such as travel to other states or locations to arrange to receive a load or supply of narcotics. In addition, it is now common for drug traffickers to have email accounts or various apps for cell phones that facilitate communications as well as the acquisition and expenditure of drug trafficking proceeds.

## INFORMATION REGARDING CELLULAR TELEPHONES

36. Based upon my training and experience, I know that persons who traffic in illegal narcotics often facilitate their criminal activity by the use of cellular telephones. Drug traffickers often store phone numbers of their customers, associates or their sources of illegal narcotics within the electronic memory of their phones, including in contact lists, address lists, recent call lists and electronic calendars. When expecting a supply of narcotics, traffickers will use cell phones to stay in communication with their source of supply to facilitate the drug transaction.

Likewise, when expecting to sell narcotics to a customer, traffickers will use cell phones to stay in communication with their customers. I have had occasion to make many arrests of drug traffickers and it is very common that cell phones are seized from the target's person at the time of arrest. It is the ready mobility of cell phones that result in their frequency as a tool of the drug trade. Here, I believe that the **Target Devices** will contain evidence of the narcotics trafficking of ALEJANDRO and other members of his DTO.

37. Based on my training, experience, I know that **Target Devices** have different capabilities that allow some of them to serve as a wireless telephone, digital camera and video recorder, portable media player, global positioning system (GPS) navigation device, a hand-held radio, and a personal digital assistant (PDA). In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the **Target Devices**, as well as evidence relating to co-conspirators with whom the **Target Devices** were in contact.

38. With regards the **Target Devices**, I request permission to enter and search the **Target Devices** for evidence relating to the Target Offenses, including evidence of communications between and among members of the ALEJANDRO DTO, and other co-conspirators, involved in unlawful narcotics trafficking activities. Furthermore, based on my training and experience, I know that internet browsing history in wireless phones can contain evidence of communications between co-conspirators who distribute narcotics, or conspire to do so. Also based on my training and experience, I know that internet browsing history in wireless phones can contain evidence of internet searches for locations and addresses of businesses associated with the unlawful distribution of narcotics such as the businesses and locations used for distributing contraband, renting, or leasing vehicles to transport narcotics, and storing illegal

narcotics such as commercial storage facilities or other stash locations. Also based on my training and experience, wireless phones may contain videos and images of coconspirators, possible locations to ship, receive, or store narcotics, the quantity of narcotics and/or shipping packages within which the narcotics are concealed, and firearms, as firearms are generally considered tools of the trade in narcotics activity. Specifically, based on my training and experience, I know the following information tends to exist on wireless telephones, including phones used by those involved in the distribution of narcotics:

  a. the telephone number, ESN number, serial number, and SIM card number of said telephone;

  b. the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory of said device;

  c. descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the above-described crimes;

  d. any and all records, however created or stored, which tend to demonstrate ownership and use of the phone, and identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the phone;

  e. any and all evidence showing or tending to show the identity of the maker or user of the data and information contained in the phone, such as passwords, sign-on codes, and program design;

  f. GPS coordinates, waypoints, destinations, location data, addresses, and location search parameters associated with GPS navigation software;

  g. saved searches, locations, and route history in the memory of said devices;

  h. internet browsing history, to include, internet searches in the memory of said device; and

  i. images and videos in the memory of said device.

  39. It is also requested that the Court authorize the retrieval of the above-described stored electronic information by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information,

or by copying said stored electronic information into storage in another device. I am aware that in some cases the software or equipment necessary to analyze wireless telephones in this manner is not readily available to law enforcement during the execution of a search and/or arrest warrant. Further, turning on wireless phones in a non-laboratory setting, where there is no "jammer" active or radio shielding devices, permits additional signals to be received by the phone and thereby alters the data present in the phone at the time of seizure. Therefore, it is often necessary to remove a seized phone to a laboratory to preserve the data therein from being corrupted.

40. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrants I am applying for would permit the examination of the **Target Devices** consistent with the warrants. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection to determine whether it is evidence described by the warrant.

41. Because this warrant seeks only permission to examine the **Target Devices** that are already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

42. The warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

43. As described above and in Attachment B, this application seeks permission to search and seize things that the **Target Devices** might contain, in whatever form they are stored. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Even when a user deletes information from a device, it can

sometimes be recovered with forensics tools. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

44. Searching for the evidence described in Attachment B may require a range of data analysis techniques. In some cases, agents and computer analysts may be able to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence. In other cases, however, such techniques may not yield the evidence described in the warrant. Criminals can mislabel or hide information, encode communications to avoid using key words, attempt to delete information to evade detection, or take other steps designed to frustrate law enforcement searches for information. These steps may require agents and law enforcement or other analysts with appropriate expertise to conduct more extensive searches, such as scanning storage areas unrelated to things described in Attachment B or perusing all stored information briefly to determine whether it falls within the scope of the warrant. Considering these difficulties, the DEA intends to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Attachment B.

## CONCLUSION

45. I submit that this affidavit supports probable cause for a warrant to search the **Target Devices**, which is described in Attachment A, and seize the items described in Attachment B as evidence, fruits, and instrumentalities of the Target Offenses, namely, violations of 21 U.S.C. § 841 (Unlawful Possession with Intent to Distribute and Distribution of Controlled Substances); 21 U.S.C. § 846 (Conspiracy and Attempt to Commit Narcotics Trafficking Offenses); and 21 U.S.C. § 843(b) (Use of a Communication Facility to Commit a

Drug Felony). The foregoing is true and correct to the best of my knowledge, information, and belief.

JEFFREY POULIN (Affiliate)
Digitally signed by JEFFREY POULIN (Affiliate)
Date: 2023.11.27 20:31:00 -05'00'

Jeffrey Poulin
Task Force Officer, DEA

The truth of the foregoing affidavit has been attested to me by DEA Task Force Officer Jeffrey Poulin over the telephone on November 29, 2023.

Date: 2023.11.29 13:34:12 -05'00'

THOMAS O. FARRISH
UNITED STATES MAGISTRATE JUDGE